UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| SCHMID PIPELINE CONSTRUCTION, INC., | ) | |
| | ) | |
| Plaintiff/ Counterclaim Defendant | ) ) | |
| | ) | |
| v. | ) | 1:13-cv-00464-GZS |
| | ) | |
| SUMMIT NATURAL GAS OF MAINE, INC., | ) ) | |
| | ) | |
| Defendant/ Counterclaim Plaintiff. | ) ) | |

**RECOMMENDED DECISION**

In this action, Plaintiff/Counterclaim Defendant Schmid Pipeline Construction ("Schmid") and Defendant/Counterclaim Plaintiff Summit Natural Gas of Maine ("Summit") assert claims arising out of a contract for the construction and installation of the "Kennebec Valley Pipeline Project." The matter is before the Court on Plaintiff's Motion for Partial Summary Judgment (ECF No. 88).[1] As explained below, following a review of the pleadings, and after consideration of the parties' written and oral arguments, the recommendation is that the Court grant in part and deny in part the motion.

---

[1] The Court referred the motion for report and recommended decision.

**BACKGROUND**

In March 2013, Summit solicited bids from contractors for the construction of a project known as the Kennebec Valley Pipeline Project (the Project). (Def.'s Statement of Additional Facts (DSAF) ¶ 1.[2]) On April 4, 2013, Schmid submitted a bid to Summit for the construction of one of five "spreads" on the Project. (*Id.* ¶ 4; Pl.'s Statement of Facts (PSF) ¶ 1.[3]) At Summit's request, on April 24, 2013, Schmid provided a follow-up bid to work on the entire Project, which had been reduced from five spreads to four spreads. (PSF ¶ 4.) Although Summit's bid invitation requested proposals based on unit pricing, Schmid was unwilling to perform work on the entire Project on a unit-price basis. (*Id.* ¶ 3.) Instead, Schmid proposed that it would bill labor, equipment, materials and subcontractor costs on a time and materials basis. (*Id.* ¶ 5.)

Schmid's April 24, 2013, proposal, authored by Josh Purrenhage, VP Operations, provided:

> We would propose a Target Cost approach to this project. Schmid can provide a detailed budget including manhours, equipment hours, materials and subcontractor costs. We would provide a detailed plan on how we intend to complete the project which would outline how we intend to meet our budgets. Labor would be invoiced utilizing straight time and overtime rates that would be inclusive of overhead, insurance, taxes, consumables, and profit. Equipment would also be invoiced either based on hourly rates or actual costs, depending on the piece of equipment, and would likewise include overhead, insurance, taxes, fuel, and profit. Direct materials, subcontractor costs, and yard rental costs would be passed through with a 10% markup.
>
> We are willing to negotiate terms for the Target Cost, but our thought is we can provide a budget and goals to meet it. As the project goes through its life cycle, we can easily forecast whether we are on target or not.
> …
> I believe that this approach would allow us to align our interests rather than be in an adversarial relationship.
> …

---

[2] Citations to Defendant's Statement of Additional Facts are meant to include reference to Plaintiff's Reply Statement, wherein Plaintiff admits, qualifies, or denies Defendant's additional statements.

[3] Citations to Plaintiff's Statement of Facts are meant to include reference to Defendant's Opposing Statement of Facts, wherein Defendant admits, qualifies, or denies Plaintiff's statements.

> By reducing our profit on this project, we believe that we can install the 353,500 lf of pipe for a budget of approximately $61,000,000, inclusive of 10% contingency.

(DSAF ¶ 6.)

On April 26, 2013, on behalf of Schmid, based upon suggested labor and equipment rates, Mr. Purrenhage provided Summit with estimated budgets for labor, equipment, subcontractors, direct materials and the hours required to complete the Project.[4]  Given the estimates, Schmid predicted that it could complete the Project within Summit's current budget.  (*Id.* ¶¶ 6-7.) Additionally, Mr. Purrenhage wrote, "We believe that Summit should have a high degree of confidence in the overall cost of the project as the three bids were closely correlated.  It is our hope that by shifting some of the risk, and thereby reducing our overall markup by 7%, this project can be performed within the budget amounts."  (*Id.* ¶ 8.)[5]

On May 22, 2013, in internal communications, Mr. Purrenhage informed Kim Smith, Schmid's VP and Controller, that he had increased the labor rate by 3.9 percent to account for the percentage of days that work might be "called" before 7:00 a.m. on account of rain, and that he had reduced the budgeted labor hours by 3.9 percent for the same reason.  Mr. Purrenhage suggested that the adjustments might put an extra percent or two in "our pocket."  (*Id.* ¶ 17; *see*

---

[4] *See* ECF No. 81-3, PageID ## 677 – 684.

[5] The parties dispute whether Schmid's estimate of the Project's cost was based on sufficient information – including Summit's description of the scope of work, Schmid's investigation of the project route, and Summit's report that three bids had similar estimates – such that Schmid could reasonably have a "high degree of confidence in the overall cost." (DSAF ¶¶ 3, 8, 14, 15.)  Additionally, the parties dispute whether they mutually understood that the tables attached to the April 26 letter proposed rates for labor and equipment and unit prices for materials and subcontractor services (Summit's assertion), or whether the proposal simply set forth "estimated allowances" with no unit pricing with the understanding that Schmid would bill Summit on a "time and materials" basis (Schmid's assertion).  (*Id.* ¶ 11.)

*also* ECF No. 91-18, PageID # 3961.)[6]  On May 23, Schmid projected that its gross profit margin was between 17 and 19%.  (DSAF ¶ 21.)[7]

On May 24, 2013, the parties executed a Construction Contract [8] (the Contract).  (*Id.* ¶ 22.) The Contract did not include a definitive commitment from Schmid regarding the total cost of the Project, and the parties proceeded on the basis of estimates.[9]  Schmid understood that communication, transparency, full disclosure, and honesty would be important to the successful completion of the Project.  (*Id.* ¶¶ 9-10.)  Schmid represented to Summit that it would reduce the cost of the Project to come within the budget, but noted that the risk of cost overruns was real, which risks included whether labor forces, on average, would be able to meet the productivity projections.  (*Id.* ¶ 12.)

On May 24, after the parties executed the Contract, Mr. Purrenhage wrote to Ms. Smith, "Average profit margin on the labor is 54% by my numbers."  In her deposition, Ms. Smith testified that the average labor profit margin was about 15%.  (*Id.* ¶ 26.)[10]

---

[6] Also on May 22, Kim Smith made a comment that could support an inferential finding that Schmid thought the Project could cost as much as $80 million.  (DASF ¶ 18.)  In her summary judgment declaration (ECF No. 99-6, ¶ 4), Ms. Smith states that the $80+ million figure was in reference to Schmid's total gross revenue for 2013 and included work other than the Project that is the subject of this litigation.

[7] Schmid made similar projections to its bonding agent, Liberty Mutual, in May and June of 2013.  (DSAF ¶¶ 109 – 100.)

[8] *See* ECF No. 81-8, PageID ## 901 – 1010.

[9] In its initial bid of April 4, Schmid stated that it would hire local contractors for asphalt, concrete, and gravel, and nonlocal subcontractors for horizontal directional drilling (HDD) work.  (Def.'s Additional Statement ¶ 4A.)  Summit asserts this fact to support an inference that Schmid would otherwise be using its own forces on the Project and billing accordingly.  The statement appears to be related to whether certain costs should have been invoiced on a "unit" basis or on a "pass through" basis.

[10] Summit asserts that Schmid "promised Summit that it would reduce its profit margin by 7% to 10% to meet Summit's budget."  (DSAF ¶¶ 21, 26.)  This appears to be a reference to the April 26, 2013, communication from Mr. Purrenhage concerning a 7% reduction in markup.

**The Contract**[11]

In its preliminary recitals, the Contract identifies Summit as the "Owner" and Schmid as the "Contractor." (PSF ¶ 9.) Exhibit A[12] to the Contract is titled Summary of Construction Work Order, Contractor Rates and Estimated Quantities for Work Awarded, Spreads 1-4. Exhibit A contains five tables (Table A through Table E). Table A is a "Summary of Budgeted Project Cost" of roughly $62 million ($62,354,362). Table B is a "Summary of Total Agreed-Upon Estimated Labor Hours and Contractor Rates." Table C is a "Summary of Total Agreed-Upon Estimated Equipment Hours and Contractor Rates." Table D is a "Summary of Total Agreed-Upon Material and Subcontractor Unit Price."

The parties dispute the intent and significance of the categories set forth in Tables B and D. Schmid maintains that Table B established Schmid's labor budget, while Table D established the budget for all subcontractor work and materials. (*Id.* ¶ 11.) Summit contends that the total estimate in Table B incorporated the cost of subcontractors if they were hired to perform Schmid's work of installing the pipeline, while Table D included unit prices and an estimated budget for other subcontractor trades. (*Id.* ¶¶ 9 – 11; DSAF ¶ 28.) As to the issue of unit pricing, Schmid asserts that Table D was "leftover" from the original contract document and was not meant to

---

[11] Schmid characterizes the Contract as a "time and materials contract," citing the deposition testimony of Kim Smith. At her deposition, Ms. Smith testified that she understood that the parties' agreement was a time and materials contract and that a September 27 amendment to the Contract clarified that fact. (PSF ¶ 16.) Summit maintains that "[w]hether 'time and materials' were compensable was a function of the terms of the Contract including Exhibit A." (Def.'s Opposing Statement ¶ 16.) In support of its position, Summit also cites Ms. Smith's deposition testimony, in which she agreed that the Contract was "actually a contract with unit rates that govern the bills" for both labor and equipment so that Schmid "can't bill beyond the unit rates." (*Id.*) Additionally, Summit notes that Ms. Smith testified that although she described at least one other contemporaneous Schmid project as a "T-and-M" (time-and-materials) contract in a work-in-progress report, she did not use that term in her work-in-progress report for Summit's Project. Instead, she referred to the agreement as a target price with amortized billing contract. (DSAF ¶ 32.) Similarly, Mr. Purrenhage wrote others within Schmid and Summit to note that Schmid would prefer that the Project's work orders describe pricing as "estimated budget price per contractor rate schedule" rather than "unit price per contractor rate schedule." (*Id.* ¶ 34.)

[12] PageID ## 948 – 953.

establish fixed unit prices for subcontractors.  (PSF ¶ 12.)  After work commenced on the Project, Schmid "passed through" to Summit every subcontractor invoice with a ten percent markup and did not bill any subcontractor work based on the rates set forth in the tables, regardless of the nature of the work performed.  (DSAF ¶ 29.)

Table E established the methodology by which Schmid would be paid, i.e., based on an amortized schedule drawn from the Target Contract Price.[13]  Table E also included figures for Schmid's weekly capital outlay and for "Minimum Weekly Footage Install."  (PSF ¶¶ 13 – 14.) Although the Contract called for weekly amortized payments in accordance with Table E, the parties also agreed to monthly reconciliation and the possible amendment of Table E.  (*Id.* ¶ 14.)

One of the columns in Table E is "Schmid Capital Outlay."  While undefined in the Contract, capital outlay referred to the amount of costs expended by Schmid in excess of the weekly amortized payments.  By agreement, the amount of Schmid's total capital outlay was not to exceed $10 million.  (*Id.* ¶ 15; Dep. of Eric Earnest at 144, PageID # 844.[14])

The Contract authorized Summit to withhold payments as follows:

[Summit] shall provide [Schmid] with written notice of an "Event to Withhold" as defined below. [Schmid] shall have two (2) weeks to cure an Event to Withhold, if [Schmid] does not cure the Event to Withhold, [Summit] may decline to process further payments in whole or in part or, because of subsequently discovered evidence or subsequent observations, it may nullify the whole or any part of any invoice previously issued, to such extent as may be necessary in its opinion to protect itself from loss because of the following ("Events to Withhold") until cured:
…
(v) Based on a review by the 5th of every month, reasonable evidence that Work is not completed within the Exhibit A, Table E Cumulative Footage Installed Requirements.

---

[13] "Target Contract Price" is another reference to the $62 million estimate.  The "amortized billing" concept reflects the target contract prices spread out in equal weekly installments over the anticipated life of the project.  (Dep. of Eric Earnest at 142:18-20, PageID # 843.)

[14] Schmid offers the statement that capital outlay was not to exceed $10 million.  Summit denies the statement, asserts that the term is undefined, and cites only the Contract itself.  Eric Earnest, whose deposition testimony Schmid relies on regarding the capital outlay concept, is an employee of Summit.

(DSAF ¶ 36.)  The Contract further stated that a party's failure to insist upon performance of any term or condition would not be construed as a waiver or relinquishment of any right.  (*Id.* ¶ 38.)[15]

Under the Contract, Schmid warranted that it "carefully investigated and evaluated the requirements for the Project and the Work to be awarded … including geographic characteristics of the land, the prevailing weather, climatic and economic conditions that may affect availability and price of labor, equipment, tools and materials, and other conditions that could affect Contractor's ability to complete the Project for the agreed upon rates contained in Exhibit A" and that Schmid would "use its own information and … not solely rely upon information shown or not shown on the plans provided by [Summit]."  (*Id.* ¶ 42.)  Schmid promised to perform all work with due diligence, in a good and workmanlike manner, and in accordance with the Contract.  (*Id.* ¶¶ 42A, 42B.)  The parties agreed that Schmid would utilize union labor on the Project.  (PSF ¶¶ 17-18.)

As to compliance with construction specifications, the Contract provided:

If apparent defects are found in materials provided by [Summit], contractor shall promptly notify [Summit] of such defects, and [Summit] will repair or replace the materials.  If Contractor fails to examine or report found apparent defects, Contractor will not be entitled to any additional compensation relating to downtime, delays or schedule extension associated with repair or replacement of the defective material.

(*Id.* ¶ 55.)  The Contract further provided: "Contractor will ensure that all materials and equipment are in compliance with the Contract …."  (*Id.*)

The Contract specified October 25, 2013, for substantial completion, and November 1, 2013, for final completion.[16]  (*Id.* ¶ 23.)  In part, the schedule was influenced by liquidated damages

---

[15] In the event of litigation, the parties agreed that Schmid would continue working on the Project and that Summit would continue to make payments in accordance with the Contract.  (DSAF ¶ 40.)
[16] These deadlines would be adjusted slightly by amendment of the Contract in September 2013.  (PSF ¶¶ 68-69.)

provisions set forth in contracts of supply entered into between Summit and certain commercial customers.  (*Id.* ¶¶ 24-26.)  The schedule for Project completion was very aggressive, but "doable" given Schmid's plan to have six contractor crews working ten-hour days, six days per week.  (*Id.* ¶ 22.)  The aggressive schedule, incomplete nature of certain construction documents, and certain unknown field conditions were understood by Schmid when it executed the Contract.  (DSAF ¶ 25.) [17]

**Nature of the dispute**

Schmid contends that Summit's Director of Construction, Bruce Madore, and Summit's Project Manager, Bryan Foster, had limited experience constructing natural gas transmission pipelines, whereas Schmid's personnel, particularly Tony Layrock, Sr., had substantial experience. (PSF ¶¶ 29-33.)  Schmid further asserts that Summit mismanaged the project and failed to review carefully Schmid's invoices.   In response, Summit argues that Schmid's performance was inefficient and that its billings were grossly inflated.  (*Id.* ¶¶ 34-41, 43.)  Among other supporting evidence, Summit notes that Mr. Purrenhage, Schmid's primary decision maker for the Project, was only in Maine for between 40 and 50 percent of the days worked on the Project.  (DSAF ¶ 122.)  Additionally, for a six-week period between August and September 2013, Schmid's second-in-command for the Project, Tony Layrock, Sr., was absent from Maine.  (*Id.* ¶ 124.)

Sometime after the start of the Project, Schmid discovered that the number of utility crossings greatly exceeded the anticipated number.  (PSF ¶ 42.)  Schmid asserts that the misunderstanding about the number of crossings was the result of information provided by Summit.  (*Id.*)  Schmid also maintains that Summit undermined the Project because it failed to

---

[17] The Contract included an integration clause, and provided that Summit could terminate the Contract on fourteen-days written notice for "whatever reason."  (DSAF ¶¶ 19, 21.)

provide completed construction plans when needed, failed to obtain necessary permits and easements on time,[18] and failed to provide timely x-ray inspection of the pipeline.[19] (*Id.* ¶ 44.)

According to Schmid, in an effort to keep pace with the Project schedule, and with the approval of Summit, it increased the labor forces, equipment, and working hours on the Project. By August, however, Schmid reduced its manpower because it had too many people working. (*Id.* ¶ 45.) Schmid asserts that it informed Summit of the increases in costs as they arose. Summit, however, citing evidence of record, argues that Schmid underrepresented its cost overruns and total cost projections. (*Id.* ¶ 46.) Schmid maintains that its increased costs and, therefore, its invoices, were reasonable.

Summit ordered a number of steel fittings for use on the Project, which fittings Schmid installed. The evidence cited by the parties could support a finding that either party was remiss, or that both parties were remiss, in certain ways regarding the inventory and inspection of certain pipe elbow fittings, which did not comply with construction specifications. (*Id.* ¶¶ 50 – 54.)

On June 3, 2013, Schmid's primary subcontractor, K&K Excavation, Inc., submitted labor and equipment rates to Schmid for K&K's work on the Project. (DSAF ¶ 43.) On June 14, 2013,

---

[18] Summit states that by June 7, 2013, it had received all necessary permits for and had authorized Schmid to work on a total of 14,286 linear feet of the pipeline route, and that the total available linear feet had increased to 201,080 by June 25. Schmid's response is that the 14,286 linear feet were not continuous, which slowed progress. (DSAF ¶¶ 47 – 48.) Schmid did not begin work until June 20, 2013. (*Id.* ¶ 49.) Schmid's rate of installation significantly lagged behind the Table E linear-feet targets through at least September. (*Id.* ¶¶ 50-60, 68.) Schmid objects to these statements, asserting that the Novkovic Declaration cited in support of the statements is unreliable due to the declarant's failure to state that he was personally involved in the permitting process and is not merely relying on business records, which records have not been authenticated under Rule 803(6) of the Federal Rules of Evidence. While Mr. Novkovic does indicate that he relied on a review of "records of Schmid's productivity maintained by Summit during the Project" (ECF No. 91-2, ¶¶ 18, 20, 22, 24, PageID # 3815), he also represents that he has personal knowledge of the facts he asserts and has reviewed documents kept in the ordinary course of business by Summit (*Id.* ¶ 1, PageID # 3812). Contrary to Schmid's contention, the Novkovic Declaration is sufficient to support the factual assertions. Moreover, the Novkovic Declaration is cumulative of other evidence cited in the summary judgment record insofar as Summit asserts, in general terms, that Schmid's rate of production was behind the Table E figures for what would represent steady prorated progress on the line.

[19] Summit denies the assertions, citing evidence that suggests that the issues should not have significantly impeded Schmid's progress.

Schmid instructed K&K to increase its labor rates to bring them "in line" with Schmid's rates.  (*Id.* ¶ 44.)  This labor rate increase was substantial.  (*Id.* ¶ 44A.)  Schmid contends that the increase was required because under the Contract, Schmid was required to use union labor rates, and K&K's rates were below the union rates.  (Pl.'s Reply Statement ¶¶ 43 – 45.)  In addition to increasing K&K's labor rate, Schmid applied a 10% markup on K&K's invoices.  (DSAF ¶ 45A.) [20]

During the course of the Project, in an effort to increase productivity, Schmid hired another local subcontractor, George Cairns & Sons, Inc.  Once again, Schmid gave the contractor the union rate and billed Summit at cost plus ten percent.  (*Id.* ¶¶ 69-70.)

**July**

On July 3, 2013, Schmid presented a budget update to Summit, which update reflected that due to the presence of unanticipated utility crossings, delays, and added work scope, the projected cost of the work had increased to $70,705,155.14.  According to Schmid, the underground utility crossing was the primary reason for the additional costs.  (*Id.* ¶¶ 61 – 62.)  Summit believed that the projected cost increase accounted for all of the unanticipated conditions that Schmid had discovered after it began its work and that this cost projection was accurate.  (*Id.* ¶ 62.)

**August – September**

In August 2013, Schmid's internal reporting contemplated a 21% profit margin on the Project.  (*Id.* ¶ 64.)  Additionally, as of August 2, 2013, Ms. Smith was predicting a 50% cost overrun with a total project cost of approximately $93 million.  (*Id.* ¶ 65.)  On August 14, 2013,

---

[20] According to Defendant's expert witness, William Schwartzkopf, this adjustment increased costs to Summit by more than $6.2 million.  (DSAF ¶ 45.)  Schmid states that there was a downward adjustment in K&K's equipment rate, which Mr. Schwartzkopf did not include in his calculations.  (*Id.* ¶ 45.)  Schmid also objects that this additional cost calculation was not disclosed in Mr. Schwartzkopf's report or deposition testimony and therefore should be excluded.  (*Id.*)  Failure to disclose an opinion is a standard ground upon which to exclude an opinion from evidence, and Summit has not responded to the objection with an indication that it disclosed this opinion.  Therefore, the calculated figure ($6.2 million) is not properly of record.

Schmid presented a budget update to Summit that revealed that the projected cost of the work had increased to between $77 million and $84 million.  (*Id.* ¶ 66.)  The update did not disclose Schmid's internal projection that the Project would cost approximately $93 million.  (*Id.* ¶ 67.)

On August 30, 2013, Summit notified Schmid that Summit was exercising its right to remove 7.48 miles of 8-inch steel pipe from the Contract based on its assertion that Schmid failed to achieve required production levels and based on Summit's concern that Schmid could not achieve the contractual completion date.  (*Id.* ¶ 75.)  Also on August 30, Summit issued a notice of intent to withhold further payments, stating as partial grounds the fact that Schmid had not met pipe installation footage requirements.  (*Id.* ¶ 74.)  Summit also informed Schmid of its intention to conduct an audit of Schmid's cost records.  (*Id.* ¶ 72.)

During August and September 2013, Schmid asserted that the Contract did not include certain horizontal directional drilling ("HDD") work required to install the pipeline under several rivers, streams and other obstructions.  (*Id.* ¶ 77.)  On September 5, 2013, Schmid presented Summit with updated budget information, which stated that the Target Contract Price was projected at $81,663,955.76.  (*Id.* ¶ 76.)  On September 24, 2013, Schmid informed its bonding agent that Schmid's profit margin at that point in time was "over 20%."  (*Id.* ¶ 78.)

**September 2013 contract amendment**

On September 27, 2013, the parties executed the First Amendment and Restatement of Exhibit A and All Construction Work Orders to the Construction Contract.[21]  (PSF ¶ 57.)  Among other things, the First Amendment replaced the Contract's Exhibit A with the First Amendment's Rider 1 and removed 7.48 miles of line work from the scope of Schmid's work.  (*Id.*)  Table A of Rider 1 summarized the budgeted project costs, specified that labor costs are in Table B, that

---

[21] *See* ECF No. 81-9, PageID ## 1011 – 1041)

equipment costs were in Table C, and that materials and subcontractors were in Table D.  Table A

also used the term "Time and Materials Based" to characterize the cost projections found in Tables

B through D.  (*Id.* ¶¶ 58, 60.)  The tables then summarized the total agreed-upon cost estimates for

Project completion in each category based on estimated hours remaining and specified rates and

prices.  Table E set forth a revised schedule of estimated payments and a revised Target Contract

Price of $73,954,829.  (*Id.* ¶ 57.)

> Rider 1, in reference to Table D's projections, stated:
>
> a) Subcontractor invoice charges will be submitted to [Summit] with the invoice charges being the actual cost to Contractor. Contractor will submit, or "pass through", Subcontractor's invoice charges (and thus, the actual cost to Contractor), plus ten percent (10%) mark-up charge, to [Summit]. Thus, [Summit] shall pay Contractor the Subcontractor's invoice charges plus a ten percent (10%) mark-up on those charges;
>
> b) The Parties hereby agree that Subcontractor may charge a mark-up on all items stated with Subcontractor's invoices, excluding all labor and any equipment currently scheduled in the subcontract.  Subcontractor's invoice charges, including properly charged mark-ups as described in this section, shall be considered invoice charges that are an actual cost to Contractor, which Contractor may mark-up another ten percent (10%) and
>
> c) Contractor's direct material costs will be submitted to [Summit] at the actual cost to Contractor plus a ten percent (10%) mark-up. Thus, [Summit] shall pay the Contractor for its direct material costs plus a ten percent (10%) mark-up on those costs.

(*Id.* ¶ 62.)

In Rider 2, the parties agreed that "Contractor's final price is based upon time and material

charges per the rates set forth in the Amended and Restated Exhibit A for actual Work completed."

(*Id.* ¶¶ 58-59.)

Table E provided "clarifications" regarding the revised schedule of estimated payments,

including the following:

1. …. Contractor will provide [Summit] a reconciliation, back-up documentation, third-party invoicing, and any other reasonable documentation [Summit] may request by the 5th of every month during the Term of the Contract.  The Parties shall revise Table E monthly to reflect a mutually agreed upon payment schedule based on the status of the completion of the base lay Work and the two HDDs [horizontal directional drillings].

2. …. If Contractor's capital outlay exceeds Ten Million Dollars … as of October 5, 2013, then [Summit] will increase the amount of the amortized payments to ensure Contractor's capital outlay remains under Ten Million Dollars … based on Table E, 'Schmid Capital Outlay' until the next reconciliation.  If Contractor requests an increase in amortized payments at a reconciliation meeting or at any time between reconciliation meetings, Contractor must provide a reconciliation with supporting third party documentation mentioned above providing reasonable evidence that Contractor's capital outlay to date is in excess of Ten Million Dollars …."

(*Id.* ¶ 63; Revised Table E, PageID # 1020.)[22]

According to Kim Smith, as of September 27, 2013, Schmid's capital outlay was $29,739,194.43.  Summit was unwilling to agree to that amount, however, in the absence of an audit, and did not authorize payment for any amount over $10 million.  Summit also did not authorize a revision of the amortized payment schedule, which payments were based on the September revised target price of just under $74 million.  (PSF ¶¶ 65-67.)

**October**

On October 2, 2013, less than a week after the execution of the First Amendment, internally at Schmid, Kim Smith wrote to Joel Iakiri advising that she foresaw "this project to be a hundred million in the end."  (DSAF ¶ 86.)  On October 2, 2013, Ms. Smith informed Mr. Iakiri that Schmid should expect to earn a profit of 15% to 17%, assuming that Schmid collects everything it has billed on T&M.  (*Id.* ¶ 87.)

---

[22] The parties again characterize "capital outlay" differently.  Schmid states that its outlay was never to exceed $10 million.  Summit states that the capital outlay was not to exceed amortized payments by more than $10 million.  (PSF ¶ 64.)

As contemplated by the First Amendment, the parties engaged in a reconciliation meeting on October 8, 2013. (PSF ¶ 83.) At that meeting, Schmid notified Summit that its Capital Outlay was $44,809,991.05. Summit did not accept and agree to pay the amount represented, and notified Schmid that it intended to perform an audit before making any reconciliation payment. (*Id.* ¶¶ 84 – 85; *see also* Dep. of Timothy Johnson, P.E. at 198, PageID # 2682.) Summit also informed Schmid that Schmid was behind on its production, that Schmid was mismanaging the project, and that Schmid was invoicing work improperly, particularly by adding a ten percent markup on top of a subcontractor's ten percent markup. (DSAF ¶¶ 90-91.) Following the October 8 reconciliation meeting, Schmid informed Summit that Schmid projected the final cost of the work to be $120 million, which amount consisted of $112 million for laying the steel pipeline plus $8 million for the HDD work. (*Id.* ¶ 88.)

On October 24, 2013, Kim Smith reported to Mr. Iakiri and Mr. Purrenhage at Schmid that the reconciliation invoice costs in aggregate totaled over $100 million. Ms. Smith noted that the amount was more than $35 million above the original job cost estimate and suggested that if Schmid collects on the difference, she would be pleased. (*Id.* ¶ 92.) On October 30, 2013, Mr. Iakiri informed Schmid's owners, Joe and Donna Brandenburg, that Schmid's billings to Summit had gone over the "$100,000,000 mark." (*Id.* ¶ 93.)

**November**

By the next scheduled reconciliation meeting on November 13, 2013, the matter of Schmid's reconciliation invoices was still unresolved. (PSF ¶ 87.) At the November meeting, Schmid asserted that its Capital Outlay had grown to $64,118,351.29. (*Id.* ¶ 88.) Summit informed Schmid that until it completed an audit, it would not increase the payment amount beyond the amortized payment amount listed in Table E, except for the additional payment for the HDD work.

(*Id.* ¶ 88; DSAF ¶ 96.)  Additionally, Summit notified Schmid that it would only continue to make the amortized payments until the Project was complete.  (PSF ¶ 89.)  Schmid ceased work on the Project on November 20, 2013, citing Summit's refusal to pay down Schmid's Capital Outlay in significant part and its failure to meet certain additional demands.  (*Id.* ¶ 90.)  As of that date, Schmid had completed over 95% of its work on the Project; though Summit maintains that the scope of the Project had been reduced by 7.48 miles of pipeline and that certain HDD work was not complete.  (*Id.* ¶ 91.)

Following the November reconciliation meeting, Schmid submitted additional invoices requesting payment from Summit in the amount of $22,717,768.58 for the remainder of the work and materials provided by Schmid and its subcontractors after the November reconciliation meeting.  (*Id.* ¶ 92.)

**Invoices**

On September 30, 2013, Schmid instructed one of its HDD subcontractors to alter its invoice to remove reference to the fact that its bill included $325,000 worth of idle time.  The invoice reflected billing for standby time during the ten days in September when the parties were working out their dispute over HDD work.  (DSAF ¶ 85.)

Schmid billed work on the Project on a regular basis by submitting to Summit an "Amortized Invoice" in the amount of the agreed upon amortized payment, as set forth in Table E and the Revised Table E, for each week.  (PSF ¶ 70.)  In addition, Schmid submitted over one hundred "Time and Material Reconciliation Invoices" with back up over the course of the Project.  (*Id.* ¶ 71.)  Exemplar invoices reflect that Schmid submitted its bills under a "Time and Material Invoice" heading using scheduled hourly rates for labor and equipment.  (*Id.* ¶¶ 72, 74.)  Subcontractor labor, equipment and materials were billed as pass through costs plus 10%.  (*Id.* ¶

73.)  The invoices included Schmid's daily progress reports ("DPRs"), which detailed Schmid's labor and equipment for each day on the Project.  (*Id.* ¶ 75.)  Most DPRs were signed by Summit's inspectors.  (*Id.* ¶ 76.)[23]

Summit paid each of Schmid's Amortized Invoices (Table E), less a ten percent retainage, for a total amount of $68,704,989.00, but Summit never paid any of the additional amounts that were billed under the Time and Materials Reconciliation Invoices.  (*Id.* ¶¶ 77 – 78; DSAF ¶ 98.) Schmid asserts that Summit never rejected any of the Reconciliation Invoices; but Summit notes that Summit never paid any of the invoices, and had informed Schmid of its concerns about the costs included in the invoices.  (PSF ¶ 79.)  Schmid's reconciliation invoices totaled $140,621,275, which does not include the 7.48 miles removed from the scope of work, but does include HDD work.  (DSAF ¶ 100.)[24]

Schmid used subcontractors for a significant portion of the work that it was to perform with its own work force (excavation, pipe-laying, and backfill).  Rather than charge the agreed upon rate for Schmid's labor and equipment, Schmid passed through subcontractor invoices with a ten percent markup.  (*Id.* ¶¶ 105 – 106.)

Schmid instructed its field personnel that when they completed the daily reports, they should modify equipment hours to match the labor hours of the operator, rather than the actual hours the equipment was in use.  Prior to this instruction, according to Ms. Smith, some foremen recorded the equipment's actual hours of use.  (*Id.* ¶ 107.)  Ms. Smith testified that she wanted to ensure a consistent approach in the field.  (*Id.*)

---

[23] Whether the signatures of Summit's inspectors "verified" the information provided in the DPRs is subject to dispute. (PSF ¶ 76.)

[24] In support of its decision not to pay the reconciliation invoices, Summit cites disagreement over what was properly compensable, discrepancies in invoices, inefficiency, and lack of production.  (DSAF ¶ 102.)

Summit's internal spreadsheet used to track Schmid's costs was labeled "T&M spreadsheet" and contained a tab labeled "pass through." (PSF ¶ 80.)  Summit did not track or record any "units" (e.g., linear feet, tons, square yards, square feet, etc.) on the Project.  (*Id.* ¶ 81.)

William Schwartzkopf, one of Summit's designated experts, maintains that because Schmid did not bill in accordance with Tables B, C, and D, and because Schmid billed for consumables and incidental expenses that were already included in the unit rates in Tables B and C, Schmid overbilled Summit by more than $20 million.  (DSAF ¶ 114.)  He also asserts that inefficiency, defective work, and other factors resulted in additional costs to Summit of between $44 and $64 million.  (*Id.* ¶ 116.)[25]

**Payments by Summit**

In total, Summit paid $104,302,455.69 on account of Schmid's work on the Project.  (*Id.* ¶ 119.)  The total includes the $35,597,466.69 that Summit paid Schmid's subcontractors.  (*Id.* ¶ 117.)

**Litigation**

In this action, Schmid seeks to recover payment for work that it performed under the Contract.  Schmid asserts theories of Breach of Contract (Count I); Violation of Maine's Prompt Payment Act (Count II), Unjust Enrichment (Count III), Quantum Meruit (Count IV); and Promissory Estoppel (Count V).  (PSF ¶¶ 94-95.)

As part of its response to the Complaint, Summit asserted a counterclaim in which it alleged, *inter alia*, that Schmid's "failure to manage the performance of the work in order to control the cost of the project" and "lack of productivity for installation of pipe" constituted a material breach of the Contract; that Schmid's decision to cease work on the Project was a material breach

---

[25] Schmid objects, based on hearsay, to Summit's reference to Schwartzkopf's expert report.

of the Contract; that some of Schmid's work was deficient, which constitutes a breach of warranties contained in the Contract; and that Schmid is liable for liquidated damages under the Contract because it failed to complete the Project.  (*Id.* ¶¶ 97-100.)  Summit asserted theories of Breach of Contract (Count I), Unjust Enrichment (Count II), Breach of Warranties (Count III), and Negligent Misrepresentation (Count IV).

**DISCUSSION**

**A.    Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'"  *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor.  *Hannon v. Beard*, 645 F.3d 45, 47-48 (1st Cir. 2011).  If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied to the extent the disputed evidence supports an asserted claim.  Unsupported claims are properly dismissed.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

**B.      Analysis**

Schmid contends that it is entitled to summary judgment on its breach of contract claim and on its claim for violation of the prompt payment statute.  In support of its argument, Schmid notes that although the Contract required payment on a "time-and-materials" basis, Summit only made the amortized payments, and did not reimburse Schmid for its capital outlay.  Additionally, Schmid argues that Summit failed to generate an issue for trial on its counterclaim for breach of contract, unjust enrichment, and breach of warranty.

**1.      *Schmid's Claims for Payment***

**a.      *Breach of contract***

The elements of breach of contract are "(1) breach of a material contract term; (2) causation; and (3) damages." *Me. Energy Recovery Co. v. United Steel Structures, Inc.,* 1999 ME 31, ¶ 7, 724 A.2d 1248.  In this case, Schmid argues that the summary judgment record establishes Summit's breach of the Contract because the Contract unambiguously provided for payment on a "time and materials" basis, and Summit failed to pay Schmid for all of its time and materials. Schmid thus maintains that the Court can enter summary judgment against Summit in the amount of $71,916,285.32, which is the amount that Schmid billed, but Summit did not pay.

When construing the language of a contract, courts must view the contract as a whole and avoid an interpretation that renders a provision meaningless.  *Whalen v. Down E. Cmty. Hosp.*, 2009 ME 99, ¶ 15, 980 A.2d 1252, 1256.  Unambiguous language receives its plain meaning. *Bangor Pub. Co. v. Union St. Mkt.*, 1998 ME 37, ¶ 5, 706 A.2d 595, 597.  If a material term is ambiguous, a factual inquiry is required and the finder of fact must consider extrinsic evidence of the parties' intended meaning. *Id.* ¶ 6.

"Whether contract language is ambiguous is a question of law …." *Id.* ¶ 5. Language is ambiguous if it is susceptible to more than one reasonable interpretation. *Richardson v. Winthrop Sch. Dep't*, 2009 ME 109, ¶ 9, 983 A.2d 400, 403. If a term is ambiguous and its construction is material to the dispute, then, generally speaking, summary judgment is not appropriate. *Boise Cascade Corp. v. Reliance Nat. Indem. Co.*, 99 F. Supp. 2d 87, 95 (D. Me. 2000).

Contrary to Schmid's argument, even if the Contract is construed as unambiguously providing for payment on a "time and materials" basis, summary judgment on the breach of contract claim is not warranted. The factual record includes evidence from which a fact finder could conclude that some of Schmid's work was deficient or performed inefficiently, and that Schmid billed incorrectly for some of the subcontract work. To enter summary judgment in favor of Schmid on this record, the Court would have to conclude that under the Contract, the nature and quality of Schmid's performance were irrelevant. Such a conclusion would be inconsistent with the record evidence that under the Contract, Schmid was obligated to perform its work with due diligence and in a workmanlike manner (DSAF ¶¶ 42A, 42B). In addition, the Court would have to disregard Summit's factual challenges to Schmid's billings (e.g., the challenges to invoices for the subcontractor's work). In short, because at a minimum, the record contains disputed factual issues as to whether Schmid satisfied its obligations under the Contract, summary judgment in favor of Schmid on the breach of contract claim is not warranted.

> b.    *The prompt payment statute*

Maine's prompt payment statute imposes certain obligations on owners of projects to make prompt payments for a contractor's invoices. 10 M.R.S. §§ 1111 – 1120. The failure to make payment as required by the statute can result in certain penalties, including interest and, in the event of litigation, an award of attorney fees. *Id.* §§ 1113, 1118(2), (4). "These statutory penalties

act as 'disincentives to withholding amounts due,' and are 'intended to augment damages that are traditionally available for contract or quantum meruit claims.'" *Cellar Dwellers, Inc. v. D'Alessio*, 2010 ME 32, ¶ 17, 993 A.2d 1, 6 (quoting *Jenkins, Inc. v. Walsh Bros.*, 2001 ME 98, ¶ 24, 776 A.2d 1229, 1237).   "[T]he availability of prompt payment remedies depends upon whether payment has been 'wrongfully withheld.'" *Id.*, 2010 ME 32, ¶ 18 (quoting 10 M.R.S. § 1118(3)). The statute does not prevent an owner "from withholding payment in whole or in part under a construction contract in an amount equaling the value of any good faith claims against an invoicing contractor, subcontractor or material supplier, including claims arising from unsatisfactory job progress, defective construction or materials, disputed work or 3rd-party claims."   10 M.R.S. § 1118(1).

As explained above, the record reveals disputes as to the quality of the work, the pace of the work, and the appropriateness of some of Schmid's invoices.   Under the circumstances, particularly where Summit has made substantial payment under the Contract, one cannot conclude as a matter of law that Summit violated Maine's late payment act.   The issue is properly left for the trial.

### 2.   *Summit's counterclaims*

Schmid argues that it is entitled to summary judgment on Summit's counterclaim for breach of contract (Count I), unjust enrichment (Count II), and breach of warranties (Count III). (Motion at 22-24.)

### a.   *Breach of contract*

Schmid's argument for summary judgment on Summit's breach of contract counterclaim is in essence the same argument that Schmid advanced in support of its request for summary

judgment on its breach of contract claim.  As explained above, factual issues remain in dispute as to the parties' breach allegations.   Accordingly, summary judgment is not appropriate.

> ### b.    Unjust enrichment

Schmid argues that the unjust enrichment counterclaim is barred due to the existence of the Contract.  (Motion at 23-24.)

> The remedy of "[u]njust enrichment describes recovery for the value of the benefit retained when there is no contractual relationship, but when, on the grounds of fairness and justice, the law compels performance of a legal and moral duty to pay." *Paffhausen v. Balano,* 1998 ME 47, ¶ 6, 708 A.2d 269, 271.  The existence of a contractual relationship, "precludes recovery on a theory of unjust enrichment." *June Roberts Agency, Inc. v. Venture Properties, Inc.,* 676 A.2d 46, 49 n.1 (Me. 1996).

*Nadeau v. Pitman*, 1999 ME 104, ¶ 14, 731 A.2d 863, 866-67.

Summit maintains that it may be able to establish that the Contract is voidable based on fraudulent inducement.  According to Summit, Schmid fraudulently represented its intention to reduce its profit to meet Summit's budget.   Assuming that it could demonstrate fraudulent inducement and thereby vitiate the Contract, Summit contends that its only means of recovery for overpayment would be its claim of unjust enrichment.  (Opposition at 34.)

"Fraud in the inducement of a contract may void or vitiate the contract."  *Barrett v. McDonald Inv., Inc.*, 2005 ME 43, ¶ 32, 870 A.2d 146, 155.  In this case, however, Summit has not established facts upon which a fact finder could conclude that Schmid's pre-contract representation regarding a reduced profit was material to the payment terms set forth in the Contract, or that Summit relied to its detriment on Schmid's representation.

In support of its argument, Summit cites a letter from Schmid that "Summit should have a high degree of confidence in the overall cost of the project as the three bids were closely correlated" and that it was Schmid's "hope that by shifting some of the risk, and thereby reducing

our overall markup by 7%, this project can be performed within the budget amounts." (DSAF ¶ 8.)   Viewed in the light most favorable to Summit, the record establishes that the parties agreed upon rate-based billing for labor and equipment and cost-plus billing for certain subcontractor work.  Because the parties did not agree that Schmid would realize a certain profit, but instead agreed to a certain rate, Summit cannot reasonably argue that the alleged representation was material to its decision to enter into the Contract.  In other words, the parties agreed to a specific rate that was acceptable to both parties and that was not dependent on Schmid realizing a certain profit.  Indeed, had Schmid not realized its anticipated profit, it could not reasonably argue that it should be paid more than the agreed-upon rate.  When the parties agreed to a specific rate, Schmid's profit, and any discussions regarding Schmid's profit, became irrelevant to the parties' agreement.  Summit's fraudulent inducement argument thus fails.

In sum, the record establishes that the dispute between the parties is in fact based in contract.  Because the record cannot support Summit's fraudulent inducement defense, the record lacks any basis upon which the Contract could be declared void.  Given the existence of a contract that cannot be voided, Summit cannot prevail on its unjust enrichment claim.

### c. *Breach of warranty*

Schmid argues that the record will not support Summit's breach of warranty claim. (Motion at 24.)  Schmid recognizes that this claim is premised on the installation of pipe elbows that did not meet specifications, but Schmid contends that the record conclusively places the blame for this on Summit.  (*Id.*)  Viewed in the light most favorable to Summit, a fact finder could reach a different conclusion.

## CONCLUSION

Based on the foregoing analysis, the recommendation is that the Court grant in part and deny in part Plaintiff's Motion for Partial Summary Judgment (ECF No. 88).  In particular, the recommendation is that the Court grant Plaintiff's motion as to Count II of Defendant's counterclaim (unjust enrichment), and deny Plaintiff's motion in all other respects.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 24th day of June, 2015.